**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 15 |
| | ) | |
| PREMIUM POINT MASTER MORTGAGE CREDIT FUND, LTD. | ) ) ) | 18-10586 (___) |
| Debtor in a foreign proceeding. | ) ) | |
| In re: | ) | Chapter 15 |
| PREMIUM POINT OFFSHORE MORTGAGE CREDIT FUND, LTD. | ) ) ) ) | 18-10587 (___) |
| Debtor in a foreign proceeding. | ) ) | |
| In re: | ) | Chapter 15 |
| PREMIUM POINT ERISA MASTER MORTGAGE CREDIT FUND, LTD. | ) ) ) ) | 18-10588 (___) |
| Debtor in a foreign proceeding. | ) ) | |
| In re: | ) | Chapter 15 |
| PREMIUM POINT ERISA OFFSHORE MORTGAGE CREDIT FUND, LTD. | ) ) ) ) | 18-10589 (___) |
| Debtor in a foreign proceeding. | ) ) | |
| In re: | ) | Chapter 15 |
| PREMIUM POINT MASTER NEW ISSUE OPPORTUNITY FUND, LTD. | ) ) ) ) | 18-10590 (___) |
| Debtor in a foreign proceeding. | ) ) | |
| In re: | ) | Chapter 15 |
| PREMIUM POINT OFFSHORE NEW ISSUE OPPORTUNITY FUND, LTD. | ) ) ) ) | 18-19591 (___) |
| Debtor in a foreign proceeding. | ) ) | |

| | | |
|---|---|---|
| In re: | ) | Chapter 15 |
| PREMIUM POINT MINI-MASTER NEW ISSUE OPPORTUNITY FUND, LTD. | ) ) ) ) ) | 18-10592 (___) |
| Debtor in a foreign proceeding. | ) ) ) | |
| In re: | ) ) | Chapter 15 |
| PPI ACQ, LTD. | ) ) ) ) ) | 18-10593 (___) |
| Debtor in a foreign proceeding. | ) ) | |

**DECLARATION OF JEFFREY STOWER IN SUPPORT OF (I) THE VERIFIED PETITION FOR RECOGNITION OF FOREIGN PROCEEDING AND (II) MOTION IN SUPPORT OF VERIFIED PETITION FOR RECOGNITION OF FOREIGN PROCEEDING AND FOREIGN REPRESENTATIVE AND FOR RELATED RELIEF**

I, Jeffrey Stower, declare as follows:

1.  I am an individual over 21 years of age and am competent to testify and to provide this Declaration in support of the *Verified Petition for Recognition of Foreign Proceeding Under Chapter 15* (the "Verified Petition") and the *Motion in Support of the Verified Petition for Recognition of Foreign Proceeding and Foreign Representative and for Related Relief* (the "Motion").

2.  Together with Mr. Kris Beighton, I am a Joint Official Liquidator (together, the "JOLs") of (a) Premium Point Master Mortgage Credit Fund, Ltd. (in Official Liquidation) ("MCF Master") – FSD 241 of 2017; (b) Premium Point Offshore Mortgage Credit Fund, Ltd. (in Official Liquidation) ("MCF Offshore" and, together with MCF Master, the "MCF Entities") – FSD 242 of 2017; (c) Premium Point ERISA Master Mortgage Credit Fund, Ltd. (in Official Liquidation) ("ERISA Master") – FSD 246 of 2017; (d) Premium Point ERISA Offshore Mortgage Credit Fund, Ltd. (in Official Liquidation) ("ERISA Offshore" and, together with ERISA Master, the "ERISA Entities") – FSD 243 of 2017; (e) Premium Point Master New Issue

Opportunity Fund, Ltd. (in Official Liquidation) ("NIOF Master") – FSD 239 of 2017; (f) Premium Point Offshore New Issue Opportunity Fund, Ltd. (in Official Liquidation) ("NIOF Offshore") – FSD 237 of 2017; (g) Premium Point Mini-Master New Issue Opportunity Fund, Ltd. (in Official Liquidation) ("NIOF Mini-Master") – FSD 238 of 2017; and (h) PPI Acq, Ltd. ("PPI Acq" and, together with the NIOF Master, NIOF Offshore and NIOF Mini-Master, the "NIOF Entities") – FSD 240 of 2017 (each a "Premium Point Entity" and, together, the "Premium Point Entities"), each in an official liquidation proceeding, (collectively, the "Cayman Proceeding"), pending before the Grand Court of the Cayman Islands (the "Cayman Court"), Financial Services Division, pursuant to The Companies Law (2016 Revision) (the "Companies Law").

3.   As such, I have authority to act on behalf of the Premium Point Entities under Cayman Islands law. The facts and matters set out in this Declaration that are within my own personal knowledge are true and correct. Where I speak to matters which pre-date my appointment as liquidator, these are based upon (a) my and my staff's review of the books and records of the Premium Point Entities; and/or (b) our various discussions with the Premium Point Entities' various service providers, including their directors and PPI (as defined below), and such facts are true and correct to the best of my information and belief.

4.   I am employed by KPMG in the position of Director, Deal Advisory. By way of unanimous resolutions of the respective voting shareholders, in May and June of 2017 I was appointed as voluntary liquidator jointly with Mr. Kris Beighton (also of KPMG) of each of the Premium Point Entities.

5.   Mr. Beighton and I both reside in the Cayman Islands.

6.    Mr. Beighton and I maintain offices at Century Yard, Cricket Square, Grand Cayman KY1-1106, Cayman Islands.

7.    A copy of my *curriculum vitae* is attached hereto as <u>Exhibit A</u>.

**A.    The Premium Point Entities Generally**

8.    By way of broad introductory summary, and subject to the more detailed account below, the position with respect to the Premium Point Entities is in essence as follows:

9.    The MCF Entities, the ERISA Entities, and the NIOF Entities are three separate fund structures. They have different sets of investors. What they have in common is that they were all promoted and managed by the same investment manager, Premium Point Investments LP ("<u>PPI</u>").[1]

10.    On April 25, 2016, a decision was taken by the directors of the MCF Entities and ERISA Entities to effect an orderly wind-down of their operations and on May 13, 2016, resolutions with respect to the MCF Entities and ERISA Entities were passed to this effect.[2] The orderly wind-down of the MCF Entities' and ERISA Entities' operations was undertaken for various reasons including redemption pressures, significant losses that had been incurred, prior discussions with certain investors and other matters.

11.    During the course of 2016, PPI became aware of an investigation by the Division of Enforcement of the United States Securities and Exchange Commission ("<u>SEC</u>") and other government authorities (together "<u>U.S. Government Authorities</u>") concerning, among other matters, valuation of certain investments held by some or all of the Premium Point Entities ("<u>U.S. Government Investigations</u>").

---

[1] Until December 31, 2012, PPI was named Premium Point Investments LLC, and from that date until January 4, 2013 was named Premium Point Investment LP. On January 4, 2013 PPI adopted its current name, *i.e.*, Premium Point Investments LP.

[2] PPI have advised that no such resolutions were sought with regards to the NIOF Entities as this was not considered necessary at the time given this was a closed-end structure with a term limit that expired in November 2016.

12.     Through 2016 and into 2017, the wind-downs progressed in an orderly fashion. In particular (a) the vast majority of assets held by the Premium Point Entities were realized and reduced to cash or cash equivalents; and (b) the majority of funds realized were returned to investors (subject to setting a reserve for future expenses, including with respect to possible claims under indemnities as a result of the U.S. Government Investigations). The view of the directors throughout this time was that effecting an orderly wind-down outside of any formal liquidation process was in the best interests of stakeholders.

**B.     The Appointment of the JOLs**

13.     In around early 2017, however, it became increasingly likely that the Premium Point Entities' auditors would not be in a position to issue an audit report on the financial statements of the Premium Point Entities for the years ended December 31, 2015 or any subsequent period. With the vast majority of the Premium Point Entities' remaining assets being held in cash, it was determined it was appropriate that the winding up of the Premium Point Entities be taken forward by independent and properly qualified liquidators.[3]

14.     For the reasons set forth above, the respective voting shareholders of the Premium Point Entities passed written resolutions (the "Special Resolutions") in May and June, placing each of the Premium Point Entities into voluntary liquidation. Pursuant to the Special Resolutions, Mr. Beighton, and I were appointed JVLs for the purpose of winding up the Premium Point Entities.

---

[3] In October and December of 2017, prior to their appointment as JOLs, Mr. Beighton and Mr. Stower, as Joint Voluntary Liquidators, with the knowledge of the Staff of the Enforcement Division of the SEC, transferred the Premium Point Entities' cash held at U.S. Bank and J.P. Morgan to EFG Bank (Cayman) in order to gain greater control of the Premium Point Entities' cash and to reduce the ongoing costs to the estate.

15. On November 10, 2017, Mr. Beighton and I, in our capacities as JVLs, caused the filing of petitions for the winding up of the Premium Point Entities in the Grand Court of the Cayman Islands (the "Cayman Court"), Financial Services Division.

16. By an Order dated December 14, 2017, the Cayman Court ordered, *inter alia*, that (a) the liquidation of the Premium Point Entities would continue under the supervision of the Cayman Court, (b) the JOLs were appointed and authorized, jointly and severally, to act on behalf of the Premium Point Entities, (c) the JOLs had the following powers set out in Part 1 of the Third Schedule to the Companies Law and may exercise such powers without further sanction of the Cayman Court including (i) the power to engage staff (whether or not employees of the Premium Point Entities) to assist in performance of their functions, and (ii) the power to engage attorneys and other professionally qualified persons to assist them in the performance of their functions (the "JOLs' Powers"), and (d) the JOLs were entitled to receive remuneration for their services (collectively, the "Supervision Orders"). A true and correct copy of the applicable Supervision Order for each Premium Point Entity is submitted with the *Evidence of the Foreign Proceeding and Statements and Lists Required by Section 1515 of the Bankruptcy Code and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure* attached to the petition for each Premium Point Entity [Dkt. No. 1].

17. Pursuant to each Supervision Order and the Companies Law (in particular, Schedule 3, Part II), without further sanction or Order of the Cayman Court, the JOLs' Powers include, in addition to those stated above among others, the power to:

    a.    Take possession of, collect and get in the property of the company, and for that purpose to take all such proceedings as he considers necessary;

    b.    Do all acts and execute in the name and on behalf of the company all deeds, receipts and other documents and for that purpose to use the company seal;

    c.    Prove, rank and claim in the bankruptcy, insolvency or sequestration of any contributory[4] for any balance against his estate and to receive dividends in the bankruptcy, insolvency or sequestration in respect of that balance as a separate debt due from the bankrupt or insolvent and rateably with other creditors;

    d.    Draw, accept, make and indorse any bill of exchange or promissory note in the name and on behalf of the company as if made by the company in the course of its business;

    e.    Promote a scheme of arrangement;

    f.    Convene a meeting of creditors and contributories; and

    g.    All other things incidental to the exercise of his powers.

**C.    U.S. Government Investigations and Indemnitee Claims**

18.    The U.S. Government Investigations have continued. Neither PPI nor the JOLs have any visibility over when these investigations may conclude and which persons or entities (if any) may become the subject of any enforcement actions that may be brought in the future by the U.S. Government Authorities. These investigations have resulted in, and the JOLs believe will continue to result in, significant claims on indemnities (collectively, the "Indemnitees") of which the Premium Point Entities may have exposure. Substantially all of the Indemnitees are believed to be based in the United States.

19.    The JOLs have been in contact with the legal representatives of Indemnitees, including representatives of Indemnitees who have provided information to the U.S. Government Authorities during the course of their investigations to date as well as those who may be asked to provide information to the U.S. Government Authorities in the future concerning those investigations. Based on current estimates which counsel to the various Indemnitees have provided with regards to what their total costs may ultimately be (which, again, are unavoidably vague and uncertain - particularly when it isn't clear which persons or entities (if any) may

---

[4] A "contributory" under Cayman law is, for all practical purposes, a shareholder.

ultimately become the subject of any enforcement actions which may be commenced in the future by the U.S. Government Authorities), there is a real possibility that the various Premium Point Entities may not have sufficient funds available to satisfy all these claims in full.

20. Since the commencement of the U.S. Government Investigations, claims have been submitted and paid pursuant to an insurance policy in the name of PPI for legal costs and other related expenses incurred by PPI, its principals and both current and former employees in providing information to the U.S. Government Authorities. This insurance policy, however, has been exhausted.

21. In circumstances where there may not be sufficient funds available to satisfy the Indemnitees' claims in full (over time, depending on how matters progress), the JOLs did not wish to prefer any of the Indemnitees over other Indemnitees or other ordinary unsecured creditors, which was one reason that the JOLs brought the Cayman Proceedings. Since the commencement of the Cayman Proceedings, several Indemnitees have inquired about who is going to fund their indemnity claims as the insurance policy has been exhausted. I, and my counsel, have informed these Indemnitees that, at this time, the Premium Point Entities cannot fund any Indemnitee claims due to their doubtful solvency and the risk of preferring one creditor over another.

22. In addition to the above reasons to commence the Cayman Proceedings, the JOLs considered that the complexity introduced by the U.S. Government Investigations (and the potential consequences of that, including the indemnification claims) had resulted in a situation where all stakeholders (including the Indemnitees along with other unsecured creditors) would benefit from a more structured and orderly liquidation process than would be able to be facilitated via a voluntary liquidation.

23. The JOLs have expressed a desire to mirror the moratorium obtained in the Cayman Islands in the United States in order to avoid a rush for assets that may advance one creditor's claim above another and thereby undermine the *pari passu* principle. Given that the Indemnitees are based primarily in the United States, and the U.S. Government Investigations are taking place in the United States, the JOLs assert that recognition of the Cayman Proceedings as "foreign main proceedings" would result in a more effective, economic or expeditious liquidation of the Premium Point Entities.

24. The SEC's Division of Enforcement has informed the JOLs that it does not oppose the Premium Point Entities obtaining Chapter 15 recognition.

25. The JOLs have notified all creditors and contributories of their intention to seek Chapter 15 recognition and none have voiced any objection to the JOLs doing so.

**D.    Potential Claims Against Former Service Providers**

26. The JOLs, on behalf of the Premium Point Entities, also wish to preserve their ability to commence any action or actions as the Premium Point Entities may have for, among other things, claims for breach of contract, tort claims and claims for securities fraud, including any claims that the Premium Point Entities may have against current and former service providers and persons associated with such service providers.

27. At this early stage of the liquidation, Mr. Beighton and I have not yet investigated any claims that the Premium Point Entities may have against anyone beyond what is necessary to identify potential defendants and statutes of limitation that may be at risk of expiring. On February 10, 2018, Mr. Beighton and I, in our capacities as JOLs, circulated notices to stakeholders of our intention to seek Chapter 15 recognition and received no objections. We believe that this demonstrates that the Premium Point Entities' stakeholders have no concern with our seeking Chapter 15 recognition in order to preserve potential claims the Premium Point

Entities may have against former service providers and persons associated with such service providers. Moreover, the service providers primarily are located within the United States and the contracts with such service providers are governed by U.S. law.

### E.    Notice to the Premium Point Entities' Creditors

28.    As required by Cayman law, on January 18, 2018, the JOLs caused notice of (i) the Premium Point Entities' official liquidation, (ii) the JOLs appointment as Joint Official Liquidators of the Premium Point Entities', and (iii) the deadline for creditors of the Premium Point Entities' to submit proofs of debt (*i.e.,* February 16, 2018) for the purposes of voting at the first meeting of creditors of the Premium Point Entities (*i.e.,* February 22, 2018) to be provided by e-mail.

### F.    No Other Foreign Proceeding

29.    I respectfully submit, as required under section 1515(c) of the Bankruptcy Code, that, to the best of my knowledge, the Cayman Proceedings commenced on November 10, 2017, in the Cayman Court, are the only insolvency proceeding of any kind pending for any of the Premium Point Entities and, thus, are the only known "foreign proceedings" with respect to the Premium Point Entities as that term is defined in section 101(23) of the Bankruptcy Code.[5]

### G.    The Chapter 15 Case

30.    By Order of the Cayman Court filed on February 26, 2018, made by the Hon. Mr. Justice Segal, being the judge assigned to the Cayman Proceedings, (the "February 26 Order"), the JOLs were authorized to file a petition for recognition of the Cayman Proceedings and for

---

[5] Although the Petitioner is confident that the Cayman Proceedings are foreign main proceedings within the definition of section 1502(4) of the Bankruptcy Code, in an abundance of caution, the Petitioner reserves the right to argue, in the alternative, that the Cayman Proceedings are foreign nonmain proceedings within the definition of section 1502(5) of the Bankruptcy Code and to seek appropriate relief under Bankruptcy Code section 1521 and any other applicable provision of the Bankruptcy Code.

recognition of the JOLs as the Premium Point Entities' foreign representatives under Chapter 15 (the "Chapter 15 Case") of title 11 of the United States Code (the "Bankruptcy Code").

31. A true and correct copy of the February 26 Order is submitted with the *Evidence of the Foreign Proceeding and Statements and Lists Required by Section 1515 of the Bankruptcy Code and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure.*

32. By filing the Verified Petition and the Motion, the JOLs seek the assistance of the U.S. courts in their efforts to (a) assist with the facilitation of the application for indemnification claims and the defence of any legal proceedings which may be brought in the United States, where substantially all of the Indemnitees are believed to be based, against the Premium Point Entities, and (b) to extend the time within which the JOLs may commence any action for, among other things, claims for breach of contract, tort claims and claims for securities fraud, including any claims which the Premium Point Entities may have against current and former service providers and persons associated with such service providers through the use of section 108 of the Bankruptcy Code, which may lead to the location and recovery of the Premium Point Entities' assets in furtherance of their duties as JOLs to liquidate Premium Point Entities' assets and repay its creditors according to their priorities. I anticipate that calling for claims and subsequently admitting them to rank for dividend will take place in the Cayman Islands as part of the Cayman Proceedings.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

**H.     The Retainer**

33.     Prior to filing the Verified Petition, I caused a retainer in the amount of fifty thousand dollars (U.S.) ($50,000) to be wire transferred to an account in the name of Schulte Roth & Zabel LLP in New York, New York.  After deduction for its fees and expenses, Schulte Roth & Zabel LLP holds such funds as a security retainer.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:  March 1, 2018          By:   /s/ Jeffrey Stower
                                           Jeffrey Stower, as Joint Official
                                           Liquidator of the Premium Point Entities

**Exhibit A**

Jeffrey Stower's *Curriculum Vitae*

# Jeffrey Stower
## Director, Cayman Islands



**Director**
Deal Advisory
KPMG in the Cayman Islands

KPMG
Century Yard, Cricket Square
PO Box 493
Grand Cayman KY1-1106

Tel  +1345 914 4444
Fax +1345 949 7164
Cell +1345 925 3444
jstower@kpmg.ky

### Education, Licences & Certifications

- BBus (Acc), LLB, Queensland University of Technology
- Certified Practising Accountant, CPA Australia
- Member, Cayman Islands Institute of Professional Accountants (CIIPA)
- Member, Recovery and Insolvency Specialists Association (RISA)
- Fellow, INSOL International
- Cayman Islands Insolvency Practitioner

### Background

Jeff is a Director in KPMG's Deal Advisory practice in the Cayman Islands. Jeff is an experienced insolvency practitioner with over sixteen years of restructuring experience, working in jurisdictions such as Australia, England and the Cayman Islands. Over his nine years in the Cayman Islands, Jeff has played a central role on a number of large multi-jurisdictional restructuring engagements attending KPMG offices across the global including England, Hong Kong, South America, the United States and other countries throughout the rest of the Caribbean.

### Experience

While in the Cayman Islands, Jeff has played a central role on the following engagements:

- SPhinX Group of Companies, facilitating the conclusion of a high-profile liquidation of a complex group of hedge funds pursuant to a scheme of arrangement including resolution of claims and litigation in the Cayman Islands and Unites States, and distribution of over US$200m to claimants.

- Beacon Hill Master, Limited, the official liquidation of a Cayman Islands Master Fund investing in US mortgage-backed securities involving liaison with the US Securities & Exchange Commission and the restatement of NAVs to facilitate a distribution of over US$360m to investors.

- Ambow Education Group Limited, a cross-border restructuring of a NYSE-listed holding company in the Cayman Islands funding education services in the PRC via a VIE structure, facilitated by the appointment of provisional liquidators in the Cayman Islands and Hong Kong.

- Axiom Legal Fund Financing Funds, an advisory engagement investigating the operations and investments of a Cayman Islands master-feeder segregated portfolio structure which were subject to allegations regarding its underlying loan portfolio to law firms situated in the United Kingdom.

- Global Partnership Fund, LP, a members' voluntary liquidation of an exempted limited partnership acting as a private-equity vehicle with investments located throughout various jurisdictions globally including India, Korea and the United Kingdom.

- Lehman Brothers Equity Finance Limited, the Court-supervised liquidation of a structured finance vehicle involving facilitating recoveries from global counterparties and liaison with Lehman appointees in Hong Kong, England and the United Kingdom for resolution of intercompany claims.

- British American Insurance Company Limited, the appointment of controllers by the Cayman Islands Monetary Authority over the local branch of Bahamian company, requiring the sale and transfer of the local book of business while facilitating a Caribbean-wide restructuring.

Jeff also regularly takes appointments as voluntary liquidator of solvent investment vehicles with outstanding regulatory reporting obligations, working closely with investment managers and other service providers to facilitate the timely winding up of these structures and distribution of funds to stakeholders in compliance with the relevant laws of the Cayman Islands.

In addition to the above, Jeff has experience in trading administration, liquidation, receivership and bankruptcy appointments both in Australia and the United Kingdom in sectors such as manufacturing, construction, retail and financial services.

### Sector Experience

Financial services, hedge funds, insurance.



© 2017 KPMG, a Cayman Islands partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International Cooperative ("KPMG International"), a Swiss entity. All rights reserved.

1

Document Classification: KPMG Confidential